**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**ROGER SHUMAN,**

                 Plaintiff**,**

**v.**

                                            **CIVIL ACTION NO.: 3:16-CV-62**
                                            **(CHIEF JUDGE GROH)**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

                 Defendant.

## REPORT AND RECOMMENDATION

On May 11, 2016, Plaintiff Roger Shuman  ("Plaintiff"), by counsel Phillip Isner, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security[1] ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).   On July 13, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.   (Answer, ECF No. 8; Admin. R., ECF No. 9). On September 29, 2016, and November 28, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.   (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17).   Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

## I.  <u>PROCEDURAL HISTORY</u>

On February 27, 2012, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and on February 25, 2012 under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on April 1, 2004. (R. 221).  Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2009; therefore, Plaintiff must establish disability on or before this date. (R. 221).  This claim was initially denied on September 5, 2012 (R. 86) and denied again upon reconsideration on March 8, 2013 (R. 114).  On April 19, 2013, Plaintiff filed a written request for a hearing (R. 167), which was held before United States Administrative Law Judge ("ALJ") Terrence Hugar on September 15, 2014 in Morgantown, West Virginia. (R. 43).  Plaintiff, represented by counsel Phillip Isner, Esq., appeared and testified, as did Larry Ostrowski, an impartial vocational expert. <u>Id.</u> On October 27, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 16). On March 7, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1)(finding that "this information does not provide a basis for changing the Administrative Law Judge's decision").

## II.   <u>BACKGROUND</u>

**A.    Personal History**

Plaintiff was born on February 13, 1979, and was thirty-three (33) years old at the time he filed his first SSI claim. (R. 221). He completed high school (R. 405). Plaintiff's prior work experience included a brief two-week stint at Wal-Mart portrait studio, as well as longer-term prior work including construction worker, cook, and telemarketer. (R. 96). He was single (divorced) at the time he filed his initial claim (R. 221) and at the time of the administrative

2

hearing. (R. 43). He has no dependent children. (R. 222, R. 387). Plaintiff alleges disability based on anxiety, depression, back pain, knee pain, leg pain, and seizures (R.264).

**B.     Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of April 1, 2004**

Plaintiff's medical records from the United States Military, from which he was separated for failure to adapt, show reports of nervousness and episodes of hyperventilating as early as September 21, 1998. (R. 331). Clinical Psychologist F. S. Jensen, Psy.D., directed personnel to "monitor signs and [symptoms] of adjustment [disorder] NOS [with] mixed anxiety." (R. 331).

On February 20, 2003, Plaintiff was taken to the Emergency Room of St. Joseph's Mercy Health Center, in "moderate to severe distress," for left lower quadrant pain that he had experienced on and off for the past six months. (R. 357). An intravenous pyelogram ordered pursuant to that complaint yielded abnormal results indicating a "high grade obstruction" of the left kidney. (R. 359). Further radiological testing clarified that there was a "high grade obstruction of the distal left ureter producing pyelorenal backflow and pelvocaliceal distention," though the exact cause of the obstruction was not observed. (R. 360).

On August 8, 2003, Plaintiff was admitted to the Emergency Room of St. Joseph's with a "scattered salmon colored rash" on his trunk for the past six months, worsening recently. (R. 364). Dr. Drake diagnosed tinea versicolor, a fungal rash, and prescribed ketoconazole. (R. 365).

**2.   Medical History Post-Dating Alleged Onset Date of April 1, 2004**

On February 20, 2008, Plaintiff was seen at the Emergency Department ("ER") of Davis Memorial Hospital after falling on ice (R. 514), complaining of "bilat[eral] knee, [left] hip pain." (R. 512). Plaintiff fell from a standing position, and had abrasions on his knees. (R. 513).

On March 27, 2009, Plaintiff was admitted to the ER in Owensboro, Kentucky following a motor vehicle accident. (R. 371). Plaintiff complained of back and neck pain resulting from the

accident. (R. 376). Relevant diagnoses included lumbro-sacral sprain and forearm abrasion. (R. 372). An x-ray of Plaintiff's lumbar spine showed mild degenerative changes without evidence of acute bony abnormality, noting "disc space narrowing is noted at L3-L4 and L5-S1." (R. 378).

On January 27, 2011, Plaintiff went to the ER complaining of "mental problems," crying, and saying that he needed someone to talk to (R. 500).  Plaintiff reported "problems [with] life," that it was "hard to hold [a] job," and he had to stay with his family. Id. Plaintiff admitted thinking about suicide, but denied having a plan to do so, and said that he would not because he knew it was wrong. Id.

On April 2, 2011, Plaintiff was seen in the Emergency Department for a fractured right hand – "communed [fracture] of the base of the [fifth] metacarpal." (R. 497). Two days later, on April 4, 2011, Plaintiff returned to the ER complaining that he "needs pain med[s,] was given Tramadol and [it had no effect on] pain;" Ultram was also ineffective. (R. 489-490). Plaintiff was given two Vicodin "to go." Id.

On June 30, 2011, x-rays of Plaintiff's left knee showed no evidence of fracture or dislocation. (R. 517). Results of a CT scan of Plaintiff's abdomen and pelvis on February 11, 2012 showed a small, three to four millimeter kidney stone in the lower right kidney, and a two millimeter stone in Plaintiff's right ureter, which was causing obstruction and mild hydronephrosis. (R. 516). A fifteen millimeter cyst was also observed on Plaintiff's left kidney, but no obstruction on that side. Id.

On May 15, 2012, Plaintiff was admitted to the Emergency Department at Davis Memorial in Elkins, complaining of "intolerable" back pain. (R. 435). Plaintiff was given Toradol, Flexeril, and Ultram while admitted, and given two Flexeril "to go." Id.

Plaintiff saw Dr. Pavlovich on June 21, 2012 complaining primarily of pain in his knees, but also in his hips, ankles, and lower back. (R. 401). As to his knees, Plaintiff reported pain and

occasional swelling in both knees for the past two years, developing gradually, and worse in his left knee. Id. Plaintiff had not experienced any injury to his knees that would explain the onset. Id. Dr. Pavlovich examined Plaintiff and found mild crepitation of the patellofemoral joint, mild tenderness over the medial and lateral joint space in the knee, and no pain on passive range of hip motion. Id. X-rays of Plaintiff's knee were essentially normal. Id. As a result, Dr. Pavlovich's assessment was internal derangement of the knee and suspected possible rheumatologic condition, for which he referred Plaintiff to a rheumatologist for further evaluation. Id. Dr. Pavlovich recommended cortisone injection treatment if no rheumatologic causes were found. Id.

On July 19, 2012, Plaintiff returned to Dr. Pavlovich after lab work showed no evidence of any rheumatologic conditions. (R. 400). Upon examination, range of knee motion was 0 – 130 degrees, crepitation of patellofemoral joint was still present, and there was small effusion in both knees. Id. Dr. Pavlovich gave Plaintiff a cortisone injection in the left knee, with the option for follow-up if more injections were needed. Id. On July 25, 2012, Plaintiff reported that the injection he received did not provide any relief, and in fact has made his knee pain worse. (R. 413). Plaintiff reported that it felt "odd" when the needle was inserted into this knee, and he suspects the needle may have "hit something" and worsened his pain as a result. Id.

At a subsequent visit on August 30, 2012, Plaintiff reported to PAC Little/Dr. Pavlovich that the cortisone injection made his knee pain worse for one to two (1-2) weeks. (R. 430). Upon physical examination, Plaintiff had "pain with patellar grind," pain on palpation over the medial and lateral joint spaces, ankle pain, "basically [] pain everywhere" he was touched. Id. Because the prior cortisone injection did not help, PAC Little/Dr. Pavlovich referred Plaintiff to formal physical therapy. Id. According to the visit notes, Plaintiff requested medication for pain. Id. When Tramadol was suggested, Plaintiff stated that those had no effect, and recommended

hydrocodone or Percocet. Id. Plaintiff was told that such medication was only prescribed for fractures or surgery, and that he would need to find a primary care doctor. Id.

On September 10, 2012, Plaintiff was seen by Kelly Poling, PT, DPT at Elkins Physical Therapy & Sports Injury Clinic for hip, knee, and ankle pain pursuant to his referral from PAC Little/Dr. Pavlovich. (R. 425). Plaintiff's history included the following:

> Pt's pain has been ongoing for years but is gradually worsening. It seems to be doubling in pain now. Walking increases his pain and he gets burning pain during squats. He also has a grinding feeling when he walks. His ankles just started to bother him not too long ago and thinks it's due to compensating for knee pain. He gets clicking in his knees often. His hips are also sore, the (R) more than the (L). His hip pain starts with soreness in his back and shoots pain down his (R) leg. He has been having the problem for a year to a year and a half but he has been unable to get to a back specialist His knee pain is worse than any other pain. He feels like they may give out but never fully did. He had a cortisone shot in the (L) knee which made the pain worse over the first week and then returned to his "normal" pain. He has taken Tramadol in the past but it doesn't help with pain and he is unable to get pain meds from any MD.

(R. 422). Plaintiff reported that his pain was aggravated by standing, walking, going up on down stairs, and bending over. (R. 425). On a scale of 1 – 10, the pain he experiences is a ten (10) at worst, a three (3) at best, and rated as seven (7) at the time of this visit. Id. Poling's assessment noted that Plaintiff "demonstrates signs and symptoms consistent with osteoarthritis in various joints and general degenerative changes in his knees," and identified his problems as 1) pain, 2) lacking full knee extension, 3) limited flexibility, and 4) difficulty with daily activities. Id. She further noted that Plaintiff would likely benefit from skilled physical therapy services, and considered his rehab potential to be "good." Id. On September 18, 2012, however, after participating in treatment for about a week with three visits to physical therapy during that time, Plaintiff complained that performing the exercises in his treatment plan was painful. (R. 418). Treatment notes document that Plaintiff "stayed sore for about an hour after treatment on Friday," and "performed exercise but [complained] of knee joint pain with all exercise." Id.

On December 19, 2012, Plaintiff saw Dr. Kafka and PAC Bird with Mountain State Rheumatology for chronic joint pain. (R. 449). Impressions included "polyarthralgias likely consistent with early [osteoarthritis]." Id. Plaintiff was prescribed Mobic, an anti-inflammatory used to treat arthritis, and further evaluation via bloodwork and x-rays was needed (R. 457). Subsequently, on December 20, 2012, x-rays were taken of Plaintiff's neck (R. 440), left hand (R. 444), right hand (R. 438), lumbar spine (R. 442), thoracic spine (R. 443), pelvis (R. 441), left knee (R. 445), and right knee (R. 439). None of these x-rays evidenced any abnormalities. Plaintiff returned to Mountain State Rheumatology on January 17, 2013 and reported that Mobic has helped the swelling in his knee, but has had no effect on his pain. (R. 462). Plaintiff was referred for pain management to Dr. Fahim per his request. (R. 463). Dr. Fahim saw Plaintiff on February 25, 2013 and prescribed Elavil and Baclofen; he also directed Plaintiff to follow up with Dr. Pavlovich about Synvisc injections. (R. 468).

On May 8, 2013, Plaintiff received a third Supartz injection in his knee, and states he has not noticed any improvement yet from the injections. (R. 556). On May 15, 2013, Plaintiff returned for his fourth injections, in both knees. (R. 557). Plaintiff expressed concern about knots that have developed "over his lower legs," as well as quadriceps atrophy. Id. Examination that day revealed continued tenderness along Plaintiff's joint lines, as well as tenderness with patellofemoral grind testing. Id. Plaintiff also presented with "several areas [appearing] to be varicosities along his lower legs" and "bilateral +1 nonpitting edema of his lower extremities." Id. Assessment was "bilateral knee osteoarthritis and bilateral lower leg swelling with varicosities," for which Plaintiff was prescribed a new cane. Id. An unaddressed letter from PA-C Heather Reesman/Dr. Pavlovich on May 17, 2013 summarized that Plaintiff "does have a little quadriceps atrophy as well as tenderness with range of motion, along with some varicosities of his lower extremities, for which the patient was prescribed compression hose." (R. 520).  On

May 20, 2013, Plaintiff again returned for his final Supartz injection. (R. 558). Plaintiff reported that although there was slight improvement for a few hours after his injections, he had seen "no considerable difference thus far." Id.

On February 13, 2014, Plaintiff was seen in the Emergency Department complaining of back pain and stating he had been unable to urinate in 24 hours. (R. 476). Plaintiff was given Zofran and Dilaudid, and discharged approximately two and a half hours later. Id.

Plaintiff returned to Tygart Valley Orthopedics again in 2014 to initiate another series of Supartz injections in his knees. (R. 560). Treatment notes from that visit on March 10, 2014, indicate that Plaintiff "is doing very well [and] responded well from his last injections." Id. Plaintiff returned on March 19, 2014 for his second set of injections, and reported "sensations of giving way of his knees," for which he was prescribed bilateral neoprene knee sleeves to us. (R. 563). Additional injections on March 24, 2014 (R. 566) and March 31, 2014 (R. 569) were documented with no additional notes; his final injection was accompanied by a note stating "He is doing well [and] has no complaints." (R. 572)

On April 10, 2013, Plaintiff had an electromyography (EMG) pursuant to complaints of parasthesia (tingling) in his hands. (R. 632). Motor and sensory examinations were normal, and results of the EMG showed normal recruitment with no fibrillation. (R. 633).

On June 2, 2014, Plaintiff returned to Elkins Physical Therapy and reported that he felt some relief after his last treatment. (R. 532) His pain that day was rated six or seven (6-7) out of ten. Id. Treatment notes observed that Plaintiff performed his "prescribed exercises with moderate difficulty." Id. Plaintiff returned again on June 19, 2014, again reporting pain relief following his last visit, and again performing his exercises with moderate difficulty. (R. 530). On June 24, 2014, Plaintiff "report[ed] he has to do a lot of lifting at home due to plumbing problems. He questioned if he needed a back brace." (R. 528). On June 30, 2014, Plaintiff

8

reported that he continues to have low back pain with activities of daily living that are temporarily relieved with modalities. (R. 526). Plaintiff expressed interest in trying a TENS unit at home. Id. Another note on the same page read, "Patient states he has back pain all the time. Pain 7/10, at worst 14/10. He states he has been doing HEP with little change [in] back pain." Id. On July 24, 2014, Gwen Kerns, PT, noted that Plaintiff "is not consistent w[ith] keeping app[ointments]," attending only five appointments in a six-week period of care from June 2, 2013 to July 13, 2014. Id. Plaintiff reported that he has good days and bad days, that day was bad, he has had no seizures recently. Id. Plaintiff also had no sciatic nerve pain for several weeks until this morning, when he awoke to find it had returned. Id. PT Kerns also noted that:

> Functional Deficits/Gains: Decrease in Oswestry Low Back Disability Questionnaire from 6 weeks ago, demonstrating improvement in his back pain. Pt is seen walking briskly several times a week within town w/ cane in appropriate hand & no limp. He walks dog briskly & frequently about town as well.

Id. At his next appointment on August 17, 2014, Plaintiff rated pain as 6-7 out of 10. (R. 532). Further documents appearing to be medical records were illegible (R. 537 – R. 550).

On July 8, 2014, imaging studies of Plaintiff's chest were conducted pursuant to complaints of chest pain. (R. 631). Results showed no abnormalities. Id. On July 30, 2014, Plaintiff received a steroid injection in his right sacroiliac joint pursuant to chronic tenderness. (R. 649). At a subsequent visit on August 21, 2014, treatment notes report that the injection helped relieve Plaintiff's radicular pain (extending down into his right hip and right leg). (R. 650). Plaintiff reports that his back pain remained, though, was continuous, and rated the severity as six out of ten (6/10). (R. 650). Plaintiff received additional injections (medial branch blocks) on September 12, 2014 in his left lumbar facet joints (R. 657), and in his right lumbar facet joints on September 3, 2014 (R. 655) and October 24, 2014 (R. 659).

On September 2, 2014, Plaintiff was seen by Ronald Mudry, M.D., pursuant to a referral for sleep apnea. (R. 614). Dr. Mudry assessed the following chronic conditions: shortness of breath, sleep apnea, disruption of 24-hour sleep/wake cycle, and respiratory insufficiency. (R. 617). Dr. Mudry prescribed Plaintiff Ambien and ordered a polysomnograph. Id. Results of the polysomnograph were negative for obstructive sleep apnea, but positive for restless leg syndrome, for which Plaintiff was prescribed Requip. (R. 635-637). Plaintiff also complained of COPD at a visit to his primary care provider on September 29, 2014, for which Dr. Kafka ordered diagnostic tests (R. 635).

### 3. Medical Reports/Opinions

#### i. *West Virginia Department of Health & Human Resources Medical Review*

On April 12, 2012, Dr. Khan conducted a physical examination of Plaintiff for the West Virginia Department of Health and Human Resources, pursuant to his application for adult medicaid (R. 383). Dr. Kahn completed a Physician's Summary based on that evaluation, listing diagnoses as dental cavities, tension/migraine headaches, anxiety, chronic lower back pain, chronic knee pain, chronic pain from kidney stones, and syncope. (R. 393). Plaintiff's prognosis was "guarded;" Dr. Kahn expected Plaintiff's incapacity/disability to last "long term." Id.

As to the physical examination, Plaintiff's "Statement of Incapacity / Disability" included constant knee pain, back problems, kidney problems, history of passing out since childhood, migraine headaches, ankle pain, and lumps under right rib and back. (R. 383). Dr. Kahn indicated abnormal findings including tensions headache/migraine, history of heart murmur, high level anxiety, back pain, and history of kidney stones. (R. 384). Dr. Kahn noted that Plaintiff was unable to find a job due to chronic pain, and is unable to stand for more than one hour due to knee pain. Id. Dr. Kahn opined that Plaintiff would be unable to work full time for at least one year, and recommended vocational rehabilitation. Id. Dr. Kahn also recommended diagnostic

tests, consultations, and treatments including orthopedic, "FP/PCPs," and two others that were illegible. (R. 385).

The DHHR also solicited the opinion of Dr. Sharon Joseph, who conducted a psychological evaluation of Plaintiff on April 6, 2012, and completed a Psychiatrist's Summary based on her evaluation. (R. 386). Dr. Joseph diagnosed major depression (recurrent, moderate) and anxiety disorder, not otherwise specified. Id. Plaintiff's psychological prognosis was "fair." Id. Dr. Joseph's report from the psychological evaluation on April 6, 2012 followed her Psychiatrist's Summary page. (R. 387). At the evaluation, Plaintiff's mood – and affective expression - appeared anxious, and his motor activity was nervous. (R. 388). Otherwise, indicators of Plaintiff's mental status were unremarkable. Id. Plaintiff's immediate memory and remote memory were within normal limits. His recent memory was moderately impaired, because he could recall only two out of four words after ten minutes. Id. Plaintiff's concentration was within normal limits, as evidenced by his Digit Span score on the Wechsler Adult Intelligence Scale – IV (WAIS-IV). (R. 389). Plaintiff's judgment was within normal limits, as evidenced by his comprehension score on the WAIS-IV. Id. Dr. Joseph recommended that Plaintiff receive psychological treatment, including individual psychotherapy, and to evaluate for appropriate medication. (R. 391).

On August 15, 2012, Dr. Sabio with Tri-State Occupational Medicine conducted a physical examination of Plaintiff pursuant to his application for disability benefits. (R. 404). Dr. Sabio reviewed Dr. Khan's DHHR examination records, as well as Plaintiff's emergency room records. Id. Review of systems was essentially normal, with the exception of extremities, spine, and range of motion. (R. 406). Examination revealed tenderness in both knees and right hip, with no effusion, redness, or heat in any joints, no edema, and no cyanosis. Id. Plaintiff had tenderness over the right superior trapezius muscle on both sides, tenderness over the spinous processes of

11

the lumbar spine, and tenderness at the right lumbar muscle, with no kyphosis or scoliosis. Id. The range of motion in Plaintiff's cervical spine, shoulders, lumbar spine, and knees were restricted by pain and stiffness. Id. Dr. Sabio's diagnostic impressions included 1) osteoarthritis of both knees, 2) seizure disorder (generalized), 3) degenerative arthritis of the lumbar spine, 4) depression, and 5) history of kidney stones. (R. 407).

### ii.   *Disability Determination at the Initial Level*

On July 12, 2012, agency reviewer and clinical psychologist Karl Hursey assessed Plaintiff's psychological evidence and opined that Plaintiff had a severe primary impairment of arthropathies (other/unspecified), and the following non-severe impairments: major motor seizures, affective disorders, and anxiety disorders. (R. 92).  Dr. Hursey found that Plaintiff had mild difficulties in maintaining concentration, persistence, or pace; and no restriction of activities of daily living, no difficulties in maintaining social functioning, and no repeated episodes of decompensation. Id. Dr. Hursey explained this opinion was based on the medical evidence of record (MER). Id. In particular, social functioning was within normal limits because Plaintiff "has friends, has fiancée, handles [activities of daily living] and [household chores]; manages his finances." (R. 93).

It was determined that one or more of Plaintiff's medically determinable impairments could reasonably be expected to produce his pain and other symptoms. (R. 93). However, Plaintiff's statements of symptoms were considered "partially credible" because they were only partially supported by the medical evidence, and were inconsistent with Plaintiff's activities of daily living. Id.  The treating source opinion from Plaintiff's primary care doctor, Farukh Khan, M.D., was assigned less than great weight because the limitations were "not substantiated by the evidence in the file." (R. 94).

On September 5, 2012, agency reviewer Pedro Lo, M.D. conducted a physical residual functional capacity (RFC) assessment and concluded that Plaintiff had some exertional limitations. (R. 94). Plaintiff could occasionally lift and/or carry 20 pounds, climb ramps/stairs, balance, stoop, crouch, crawl, and kneel. Id. Plaintiff could frequently lift and/or carry 10 pounds, and had no limitations on pushing and/or pulling, other than the weight restrictions indicated for lifting and carrying. Id. Out of an eight-hour workday, Plaintiff could stand and/or walk for a total of four hours and sit for about six hours. Id. As to environmental limitations, Plaintiff must avoid all exposure to hazards, avoid concentrated exposure to extreme cold or heat, vibration,  and could have unlimited exposure to wetness, humidity, noise, and fumes. (R. 95). Dr. Lo based these limitations (solely, apparently) on Plaintiff's "[history of] seizure." Id. Plaintiff's past relevant work included "construction worker" from 1999 – 2004, "cook" from 1997 – 1998, and "telemarketer" from mid-1998 – late 1999. (R. 96). Plaintiff is limited to unskilled work by his impairments, and to sedentary work by his RFC. (R. 97).

### iii.   *Disability Determination at the Reconsideration Level*

On March 8, 2013, agency reviewer James Bartee, Ph.D. affirmed Dr. Hursey's prior psychiatric assessment as written, explaining that "no newly arising [mental] conditions or evidence or worsening signs or [symptoms] are documented." (R. 122). Dr. Bartee also noted that he did not see "any [medical evidence of record] pertaining to a mental health condition during the [date last insured] period;" as a result, there was "insufficient evidence to adjudicate." Id. On March 8, 2013, agency reviewer Fulvio Franyutti, M.D. (R. 128) affirmed the prior determination of "not disabled," despite the addition of a second treating source opinion from Dr. Pavlovich. (R. 123). Dr. Franyutti declined to afford great weight to either of the treating physician's opinions in the record, for the same reason – verbatim – as to each: "The opinion relies heavily on the subjective report of symptoms and limitations provided by the individual,

and the totality of the evidence does not support the opinion. The opinion is without substantial support from other evidence of record, which renders it less persuasive." (R. 126-127).

## C.     Testimonial Evidence

At the ALJ hearing held on September 15, 2014, Plaintiff testified that he had been engaged for about four years, and has no children. (R. 50). Plaintiff testified that the last place he worked was the Walmart Portrait Studio in 2010, for approximately two weeks. (R. 49). He was told not to report to work after having a seizure necessitating time off:

> I had a seizure in my house and I had a nurse actually in my home telling me I wasn't allowed to go to work for the next three days and when I called in to let them know, I even told them that they could speak to the nurse that was standing there in my home, and basically the manager told me on the phone that if I didn't come in the next day, that she was just going to write me off the schedule altogether.

(R. 49).

Plaintiff has not recently received treatment for seizures, because doctors have told him he does not have seizures regularly enough for such treatment. (R. 53). Plaintiff testified that the frequency of his seizures varies from "once or twice every couple of months" at best, to "two or three" per week at worst. Id. "Most of the time," Plaintiff estimated on average that he "go[es] two or three months without having one." Id.

As to his other physical impairments, Plaintiff testified that he also experiences back pain associated with degenerative disc disease (R. 63), knee pain associated with a lack of joint fluid for which he undergoes regular therapy, and arthritis. (R. 65-66). As a result, Plaintiff was prescribed a cane, which he uses regularly, at home and outside his home. (R. 67). Despite that, he still falls "once or twice a month" as a result of dizzy spells brought on by standing on his feet too long or walking for too long. (R. 69). In addition to his cane, Plaintiff also uses a device to help him reach things high up, because raising his arms too high is painful. (R. 70).

I don't know if it's from the pain or, you know, I would imagine it probably is either that or the panic. I start getting dizzy spells and, you know, I'll pass out and hit the floor like, you know, like in two seconds and then there's other times when, you know, like I live in a two-story house and it's really, really, really hard for me to get upstairs. It takes me probably five minutes to climb 10 steps and by the time I get to the top, my knees are hurting me so bad that there's been times I've gotten halfway up the steps and fell down because I couldn't make it all the way.

As to his back, Plaintiff testified that he experiences significant back pain that affects his

ability to walk, and decreases the range of motion in his lower back and arms. (R. 63-70).

A    It shoots all the way down my leg and into my -- into my knees. If -- if I stand too long, my knees just start hurting so bad I can't handle it. If I sit too long, my back starts hurting so bad I can't handle it. It's like I'm up and down and up and down and up and down every 20 minutes unless I'm laying flat. If I'm laying flat in bed, I can handle it for maybe an hour and then I have to move. I've got to somehow turn myself to where the pain will stop.

Q    Now when you are sitting, do you find yourself shifting position and things like that in your chair?

A    Oh, yes. Oh, yes. I -- I can't I can't sit in one place for more than maybe 15 or 20 minutes and I've got to get up, I've got to move around, I've got to do something, but at the same time, you know, that doesn't help much because when I get up on my feet then my knees start hurting real bad.

(R. 63).

Q    Okay. All right. Now does that back pain give you any trouble -- other pain will get your knees and stuff down the road, but the back pain give you any trouble moving around?

A    Yes.

Q    All right.

A    I can't -- I can't bend backwards at all. When I bend forward, I can't -- I can't bend any further than maybe – you know, maybe touching the bottom of my knee.

Q    Uh-huh.

A    And -- and it starts hurting so severe, I can't handle it. I can't reach down, I can't pick anything up off the floor.
When I -- when I stand up if I get any further than just a straight up and down, my – my back just starts hurting so bad, you know, I just wish -- sometimes I wish, you know, it just the way the pain hurts, sometimes I just feel like, you know, it might be better if I just didn't have any feeling at all.

(R. 64-65). Relatedly, Plaintiff testified that the doctor who has been giving him injections in his

back was "testing to see how they would work," because he was considering "doing a burning of

the nerve" in hopes it will decrease Plaintiff's back pain. (R. 64).

Plaintiff testified that his mental impairments included anxiety/panic attacks, depression, and agoraphobia (R. 56-58). Further, his mental impairments Plaintiff testified that he has had anxiety "[his] whole life." (R. 59). His panic attacks have worsened over the years, the frequency increasing from "once every two or three months" four to five years ago, to "two or three times a week" currently. (R. 58-59). Plaintiff experiences panic attacks generally, whenever he worries about something; but he also experiences panic attacks in response to specific stressors, including crowds of people and leaving his home. Id.

Q       Okay. And I think that Clear Creek diagnosed you with agoraphobia. Do you have some fear about leaving your house?

A       Yes, I do. Every time I walk out my door, it's like I can't go anywhere without my fiance being with me because I'm scared to death if I walk out the door something's going to happen. I'm scared to death I'm going to have an attack or I'm scared to death that, you know, my knees are going to give out on me or, you know, I might fall down and -- and not be able to get back up and not have anybody around to help me. You know, I'm scared to death that I'm going to get hit by a car or it's just everything. It's just the whole -- everything around me. Just everything freaks me out.

Q       So leaving your house triggers panic attacks?

A       Yes.

Q       Being around people?

A       Yes.

Q       How many people does it take to make you feel uncomfortable?

A       There's -- probably any more than five or six maybe. I can be around like -- like I go to my sister's house every once in a while, you know, if I have a good day and I -- I -- I feel that I can get up and actually go somewhere. My sister lives a block and a half away from me. So I'll go down to my sister's house. Usually there's 3 or 4 people there and that doesn't bother me too much, but if I get like 8 or 10 people around me, I start flipping out. I -- I got to -- I got to leave, I got to go home, I got to be by myself, something.

Q       Now the people at your sister's house, are those people you know?

A       Yes, they're my family.

Q       Okay. Now do you have more anxiety whenever you're around people you don't know?

A       Slightly, but it even happens around my family – I can't even attend a family reunion because I get around -- I just get around massive amounts of people and it just flips me out . . . it just sends me into panic attacks.

(R. 56-57).

A       [I]f I start getting a bunch of people around me, it -- I mean any day, it

16

doesn't matter what it is, everyday of the week if I have -- if I have too many people around me, I mentally -- I just flip out. I don't know what's going on, I worry about everything, I, you know, I feel like there's people hovering over me and it just --

Q    What's --

A    -- can't handle it.

Q    -- what's it like when you're in the process of having a panic attack?

A    I can't breathe, I start getting numb like all over. My hands they actually draw up. My -- my fingers start doing like these -- this -- this kind of thing and they start drawing up and locking and it's like I can't move them. I feel like I'm going to pass out. I -- I need water like really bad because if I don't keep myself cooled down, it just -- it -- I don't know. I -- it scares me to death every time it happens. I'm afraid I'm going to die.

Q    How long does a normal panic attack last?

A    Normal? The average panic attack usually lasts three or four minutes. I've had them last clear up to 10 or 15 minutes.

Q    Are you going to be able to focus and pay attention at work if you're in the process of those?

A    No, definitely not. I feel like if I'm at work and I have a panic attack, I mean I can't even -- I can't even concentrate when I have them at home and I have people trying to help me. I can't even concentrate on what's going on. A lot of times, you know, a lot of times when it's done and over with, I don't even remember, you know, a lot of things that are said to me or done or because it just -- I lose all focus. I don't know what's going on.

Q    And you feel like you would have more of these if you were out in public and stuff more often?

A    Yes, absolutely.

(R. 59-61).

Plaintiff also testified regarding his daily activities. He does not have a driver's license and has not driven since being involved in a car accident in 2009. (R. 51). Plaintiff testified that "it scares [him] to get behind the wheel of a car" now, as the accident "did things to [him] emotionally and mentally." Id. As a result, Plaintiff "ha[s] to walk everywhere [he] go[es]." Id. (explaining that "I don't leave the house very often though. Most of the time I have other people that go shopping for me and most of the time, I just sit at the house and don't do anything.")

Plaintiff testified his days consist mostly of watching movies or playing games on his computer, though he spends some days just "laying in bed resting." (R. 52). He has a "special care worker" that takes care of any "major things" he needs done in the house. Id.

17

Plaintiff has a pet dog. (R. 53). Plaintiff testified that he used to walk and care for his dog up until six to eight months ago, when he had to stop walking the dog because she had "a lot of muscle and she pulls on me a lot and hurts me." Id. Now, his nephew comes over and walks her two or three times per week (R. 52).

In addition, Plaintiff testified that he also has problems with bladder incontinence that he believes are related to kidney stones he has had in the past. (R. 70-71), as well as heart problems from a murmur and slight valve leak (R. 75).

Plaintiff's attorney asked Plaintiff what he thinks prevents him from working with respect to his impairment. Plaintiff responded:

> Just all my pain. I can't -- I can't -- like I said before, I can't bend over which keeps me from being able to pick things up off the floor, I can't stand too long which keeps me from being able to vacuum or even fix my own meals because if I have to cook something, I have to stand in front of the stove and I can't do that because I can't, you know, I can't bend over, you know, over the stove to be able to reach things. I can't stand too long to be able to stand there and watch it. It's just – it -- I mean it's just my pain, you know, and everything that –everything that I'm going through. It just prevents me from being able to do the things that I would like to be able to do.

(R. 72-73).

Plaintiff elaborated that although he had tried to apply for jobs over the last few years, employers did not want to hire him because of his medical problems. (R. 73). Plaintiff admitted when questioned by his attorney that, had he been hired, he did not believe that he would have been able to work any of the jobs he applied for full time. (R. 74). Nonetheless, Plaintiff explained:

> I was applying for them because . . . what can you do . . . when you don't have an income and . . . whether I'm going to get a job or not, I have -- I have to try, you know what I mean, and I've tried and tried and tried and, like I said, every time I fill out an application, I don't want to . . . get in trouble for fraud or something like that and so when I fill out a job application and it gets to the medical part, if I just leave that blank, that's the same as lying to them because I do have medical problems and when I fill that medical section out of the job application, what I'm hearing 99% of the time is you're a risk to yourself and your work environment and we can't hire you.

(R. 74).

**D.     Vocational Evidence**

Also testifying at the hearing was Larry Ostrowski, a vocational expert ("VE").  Mr. Ostrowski characterized Plaintiff's past work with West Virginia's Choice as a "companion" as light work, semiskilled, with a Specific Vocational Preparation ("SVP") of three (3). (R. 79). The ALJ did not appear to question the VE specifically regarding Plaintiff's ability to "perform any work" (R. 80). The VE gave the following responses to the ALJ's hypothetical:

> Q:     Dr. Ostrowski, I'd like you to assume like you to assume a hypothetical individual with the past job you just described. Further assume the individual is limited to work at the sedentary exertional level except the work is with occasional posturals, except no crawling or climbing of ladders, ropes, or scaffolds and no exposure to hazards such as unprotected heights and moving mechanical parts; so no concentrated exposure to extreme heat, extreme cold, and vibration; also no foot controls; and allows the use of a cane for all ambulation. Can the hypothetical individual perform any work and if so, please give me some examples?
>
> A:     Yes, Your Honor, and I'll define the local economy as 20% of all jobs in the State of West Virginia based on the Department of Labor Statistics. There would be the work of a charge account clerk; this is a sedentary and unskilled job with an SVP of 2; in the local economy there are 50 jobs; in the national economy 33,000 jobs; the DOT is 205.367-014.
> There would be the work of a telephone quotation clerk; this is a sedentary and unskilled job with an SVP of 2; in the local economy, there are 75 jobs; in the national -- national economy, 89,700 jobs; the DOT is 237.367-046.
> There would be the work of a document preparer; this is a sedentary and unskilled job with an SVP of 2; in the local economy, there are 200 jobs; in the national economy, 143,000 jobs; the DOT is 249.587-018.

(R. 80).

Incorporating the above hypothetical, the ALJ then questioned the VE regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels. Finally, the ALJ questioned the VE regarding Plaintiff's ability to work assuming he is completely credible as to the severity of his condition:

> Q:     And, Dr. Ostrowski, for the second hypothetical, I'd like you to consider a

hypothetical with all the same – the hypothetical individual has all the same limitations as the first hypothetical, but now with the additional limitation here at hypothetical two that the individual must be limited to simple, routine, and repetitive tasks; not able to perform at a production-rate pace, but can perform goal-oriented work; must not entail no more than occasional interaction with supervisors, coworkers, and the public. With these additional limitations here at hypothetical two, could the individual still perform the occupations you said were available at hypothetical number one?

A:      This individual could do the work as a document preparer, but not the work of telephone quotation clerk nor charge account clerk, Your Honor.

Q       Okay. Are two additional occupations available here at this hypothetical two?

A       Yes, Your Honor. There would be the work of a surveillance system monitor; this is a sedentary and unskilled job with an SVP of 2; in the local economy, there are 30 jobs; in the national economy, 25,300 jobs; the DOT is 379.367-010. There would be the work of an ample sealer; this is a sedentary and unskilled job with an SVP of 2; in the local economy, there are 40 jobs; in the national economy, 32,200 jobs; the DOT is 559.687-014.

Q       Dr. Ostrowski, how much time is allowed off task jobs in the economy?

A       There are studies that show that an individual can be off task up to 10% and still generally be able to maintain levels of productivity required by employers.

Q       And how many unexcused or unscheduled absences do employers customarily tolerate from their employees per month?

A       It's my experience in working with employers that they will tolerate an individual being late for work, leave work early, or miss an entire day and they will tolerate up to two incidents per month before an individual may experience consequences regarding the incidents.

Q       And how many routine rest or break periods do employers customarily permit their employees per day?

A       Typically, employers provide for breaks of 15 minutes in the morning, 15 minutes in the afternoon, and 30 minutes for lunch.

(R. 81-82).  Plaintiff's attorney then questioned VE Ostrowski when provided the chance:

Q       Dr. Ostrowski, if you added to the second hypothetical the additional restriction of a sit/stand option, would that have any effect on the -- the jobs that you have listed?

A       It would depend on the requirements for the sit/stand option. Generally it would not.

Q       Okay. Well, Mr. Shuman has testified that he needs to rotate between sitting and standing about every 15 to 20 minutes and maybe do some -- some brief walking around for a couple of minutes in between those times. With that parameter, would that allow you to narrow your answer in any way?

A       So the individual would be off task from four to six minutes of an hour?

Q       Yes.

A       If an individual were off task six minutes per hour, the individual would be off task more than what would be acceptable to employers.

Q       And then, of course, if you added to that some unscheduled bathroom breaks over

20

and above your normal 15-minute break, that would add to that potential total of
10% off task, is that correct?

A     Yes.

Q     All right. And the same would be if you had to stop for a few minutes if you
began to experience a panic attack. That all kind of goes into accumulation on the
10% figure?

A     Yes.

(R. 82-83).

## E.    Report of Contact Forms or Disability Reports

### a. *Disability Reports*

On an undated Disability Report, Plaintiff listed conditions affecting his ability to work
as "bend knees they crack & grind/constant pain, back problem, seizure, [and] depression." (R.
264). Plaintiff last worked on December 31, 2009, and stopped working because of his
conditions. Id. He worked as a fast food cook from 1997 – 1998, as a telemarketer from 1998 –
1999, and as a construction worker from 1999 – 2004. (R. 265). Plaintiff included this statement:

> I have been unable to see any doctor even though I am not well because I do not have the
> money to do so and cannot get a medical card. I just go to the emergency room when I
> can't stand the pain or when I get very sick. Emergency doctors [sic] has referred me to
> go see a speacialist [sic] on several occasions but I have not followed through because I
> have no health insurance and no money. The last time I was in the ER at Davis Memorial
> Hospital, I was advised to see a Urologist. I am really in bad shape. I've had seizures
> since I was a child. I still suffer from seizure attacks but not as frequent as when I was a
> child. My seizure at work 9 months ago got me fired.
> I also need medicine on a regular basis but can't afford to buy them. Prescriptions from
> the ER doctor always goes [sic] unfilled because I don't have the money to have the
> prescription filled.

(R. 269). Plaintiff reported going to the Emergency Room at Davis Hospital for "excruciating
pain due to kidney stones." (R. 267). He reports having an MRI/CT scan on the lower half of his
body in February 2012, and an x-ray of his back in 2004. Id.

A second Disability Report (Appeal) submitted on November 12, 2012, indicated that
since the last report, Plaintiff's sciatic nerve has been bothering him a lot, worsening beginning
in September 2012, and it has affected his ability to do things. (R. 280). In particular, Plaintiff

began needing help with personal care; sometimes his fiancée has to help him get in and out of the shower, or help him shower when he is in a lot of pain. (R. 283). Plaintiff had begun seeing Dr. Pavlovich at Tygart Valley Orthopedics for sciatic nerve problems, as well as his knee and back pain. (R. 281).

A third Disability Report (Appeal) submitted on May 7, 2013 provided information regarding Plaintiff's medications and treatment providers. Plaintiff continued to be treated by Dr. Pavlovich at Tygart Valley Orthopedics for back and knee pain and sciatic nerve issues. (R. 298). Plaintiff had additionally begun seeing Dr. Khan for general medical care (R. 298), Dr. Kafka at Mountain State Rheumatology for his osteoarthritis, and Dr. Fahim at DMH Pain Management Clinic for chronic pain. (R. 297). His current medications included Amitriptyline for depression and arthritis, Cymbalta for osteoarthritis, Meloxican for pain and inflammation, Bacofen, a muscle relaxant, and Prilosec for heartburn. (R. 299). A Claimant's Medication form (completed - it appears - in May 2013) also listed Gabapentin, Ameprezole, and Qvar. (R. 305). A patient summary from Tygart Valley Orthopedics listed Plaintiff's medications and dates as follows:

| Medication | Date |
|---|---|
| Amitryptyline 25 mg tablet | 02/19/14 |
| Baclofen 10 mg tablet | 10/08/13 |
| Baclofen 20 mg tablet | 03/07/14 |
| Clindamycin 300 mg capsule | 02/23/13 |
| Cyclobenzaprine 10 mg tablet | 06/18/12 |
| Fluvirin 45 mcg | 10/08/13 |
| Gabapentin 100 mg capsule | 03/07/14 |
| Meloxicam 15 mg tablet | 02/19/14 |
| Omeprazole 20 mg capsule | 02/18/14 |
| Prednisone 20 mg tablet | 06/29/13 |
| Qvar 80 mcg | 03/07/13 |
| Tramadol 50 mg tablet | 06/18/12 |

(R. 559).

### b. *Personal Pain Questionnaire*

Plaintiff completed a Personal Pain Questionnaire on March 16, 2012, reporting on pain he experienced in his back, knees, and kidneys. (R. 243). As to his back pain, Plaintiff indicated that he experienced back pain continuously, lasting "all day most of the time," though he does "have some good days." Id. Plaintiff described his back pain sensation as aching, stabbing, burning, cramping, and sharp. Id. Plaintiff noted that "almost everything" makes his back hurt, and he has not found anything yet that is effective in relieving his pain. Id.

As to his knee pain, Plaintiff described his knee pain sensation as aching, burning, and stinging. (R. 244). He has this pain when he walks, and occasionally even when not walking; sometimes, it causes him to be unable to walk. Id. Plaintiff categorized the pain as "severe," lasting usually for a few hours. Id. Plaintiff reported that his knee pain is made worse by "walking or anything active," and that resting "helps a little." (R. 245).

As to his kidney pain, Plaintiff described that as stabbing, burning, and stinging. (R. 245). Plaintiff listed the frequency of kidney pain at "2 or 3 times" per year, but also wrote "kidney stones every few months for years" below. (R. 246). Plaintiff described this as the "worst pain in the world," requiring prescription medications from the hospital. Id. Plaintiff reported taking hydrocodone for his kidney pain, and that it only helps "sometimes." Id.

### F.    Lifestyle Evidence

### a. *Adult Function Reports*

On an Adult Function Report dated March 16, 2012, Plaintiff stated his ability to work is limited by difficulty standing or walking for more than an hour without being in pain. (R. 248). As to his daily activities, Plaintiff reported that he usually stays home and watches television. (R. 249). On days he is able, Plaintiff tries to walk to his sister's house about three (3) blocks away "for exercise," though he is not able to do that often. Id. Plaintiff does not care for any other

people or animals. Id. He notes that he has "always been an active person," but now has trouble walking to his mothers' without being in pain. Id. Plaintiff reports that his pain is affecting his sleep, explaining that he has "not had a good night of sleep in years," and "a lot of" pain keeps him awake at night. Id. He also reports having sleep apnea. Id.

Plaintiff denies needing reminders to tend to personal needs and grooming, or to take medicines. (R. 250). He does prepare his own food; though he used to cook a lot, he is now limited to "something fast like sandwiches or something [he] can put in the oven." Id. Plaintiff does so once or twice a day, unless he is in pain. Id. As to house work, Plaintiff reports being limited to washing dishes or sweeping and mopping, but has to take breaks during these activities. Id. Plaintiff spends about two hours total, one or twice a week, doing these two chores. Id. At that time, Plaintiff denied needing help to do these chores, but observed that he has difficulty getting started because he "know[s he] will hurt when [he] is done." Id.

Plaintiff reported that he goes outside "once or twice a week." (R. 251). He does not drive, and walks instead when he does leave his house. Id. Plaintiff reports that he is able to leave his house alone, but he usually does not, in case he has a problem while he is out. Id. Plaintiff shops for groceries once a month, and it takes "a long time because [he has] to pace [himself]." Id. Plaintiff reports that he is capable of managing his finances generally. (R. 251-252).

As to hobbies and interests, Plaintiff reports that he enjoys being active and was "very active" until the last year or two, but is unable to do much now. (R. 252). He reports having "a lot of depression" as a result of being unable to do activities he enjoys. Id. As to social activities, Plaintiff reports spending time with others once or twice a week, wherein he mainly just sits and visits. Id. The only place he really goes is to see his family once or twice every couple of weeks. Id. Since his conditions have gotten worse, he "just stay[s] home most of the time anymore." (R.

253). Plaintiff reported that his conditions affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and concentrate. Id. Plaintiff "can't say how much, but all of these things cause [him] pain in [his] knees [and] back. Id. Plaintiff reports only being able to "walk a block or [two]" before needing to stop and rest for ten to forty-five minutes, but he is still in pain when he starts again. Id.

Plaintiff reports his ability to pay attention depends on the activity, but usually is limited to about an hour. (R. 253). Plaintiff is able to follow written and spoken instructions "fairly well." Id. Plaintiff gets along "well" with authority figures, for whom he has "very high respect." (R. 254). He denies being fired or laid off from a job due to problems getting along with others. Id. Plaintiff does not handle significant changes in a short period of time well. Id. As to unusual behaviors or fears, Plaintiff "recently began not to spend a lot of time with many people at once," and "prefer[s] to be alone a lot." Id. Plaintiff wears glasses to correct his vision. Id. He reported not taking regular medications at the time of this report. Id. In the "Remarks" section, Plaintiff elaborated:

> I was on crippled childrens [sic] as a child for seizures, still have them as an adult every month or 2. I have depression problems because of what I go through. I have times very often that I feel like what have I done to deserve going through these things.

Id. One other sentence following this was faint and illegible.

On a second Adult Function Report dated November 12, 2012, eight months later, Plaintiff reported that his conditions had gotten worse, and were increasingly impacting his abilities (R. 288). He reported now walking with a cane and knee braces, which were recommended. (R. 294). He no longer goes out alone; his fiancé goes with him to make sure he does not fall or have an accident. (R. 291).

He still grocery shops once or twice a month, but now has to use the "electric scooter" supplied by the store, and it takes a couple of hours. (R. 291). Plaintiff reported that he still does

not drive. Id. In contrast to the previous report eight months earlier, Plaintiff now reported problems remembering and needing to be reminded to go places. He also reported that he now had problems getting along with others, because "sometimes [he] feel[s] depressed and [snaps] at people, or get[s] upset over small things." (R. 293). Plaintiff's ability to handle stress and changes had also deteriorated from the prior report, both now listed as "not well." (R. 294). Plaintiff noted that he seems to "be stressed a lot and it causes depression," and further that he "seem[s] to be paranoid about everything" and "worr[ies] constantly." Id.

### b. *Coordinating Council for Independent Living - progress notes from March 18, 2013 to August 21, 2014*

On October 7, 2013, personnel from the Coordinating Council for Independent Living ("CCIL") conducted a home visit and noted that Plaintiff complained of pain in his back and legs, reported that he recently began taking Neurontin and it helps "some." (R. 607). CCIL records show that a nurse provided partial assistance to Plaintiff with grooming, bathing, dressing, and medication; and total assistance with getting on and off the toilet, repositioning/transferring, meal preparation, housecleaning, laundry, and washing dishes. (R. 577). Other records from this ongoing assistance document essentially the same for each day of assistance throughout the period of records provided. (R. 578, R. 580). On November 5, 2013, CCIL records of a home visit note that Plaintiff was having difficulty walking that morning, stating that his right sciatic nerve was bothering him. (R. 604). Plaintiff rated his pain as eight out of ten (8/10) on a pain scale from one to ten (1 – 10). Id.

### c. *Adult Seizure Form*

On an Adult Seizure Form dated March 19, 2012, Plaintiff reported that he was not currently being treated for seizures, and indicated he had "no insurance to see doctors." (R. 257). He was last regularly seen as a teenager at Ruby Memorial. Id. Plaintiff's three most recent

seizures occurred in September 2010, November 2010, and June 2011. (R. 259). He has not had any seizures in the past six months as far as he knows (has "some when sleeping, sometimes without knowledge," unless someone else sees it happen), but had one or two in the past year. Id. Just before having a seizure, Plaintiff reports feeling normal; it "hits [him] fast most of the time." Id. When he has a seizure, Plaintiff gets light-headed, then loses consciousness; he wakes up moments later very weak and tired. (R. 258-259).

Other individuals who have seen Plaintiff have a seizure also completed part of the form. Peggy McWhorter reported witnessing two seizures. (R. 260). She reported that Plaintiff said he was light-headed and had to sit, lost consciousness, and "went completely stiff." Id. On these occasions, Plaintiff did not bite his tongue or lose bladder or bowel control; no injuries were observed. Id. Ms. McWhorter reported that after these seizures, Plaintiff is extremely weak, has headaches, and says he is extremely thirsty and really tired. Id. Misty Ferrell reported witnessing three or four seizures, in which Plaintiff "passes out after complaining of feeling sick." (R. 261). She observed Plaintiff lose consciousness for half an hour to one hour. Id. Immediately afterward, Plaintiff is "drowsy, a little out of it for a min[ute], thirsty, [and] weak." Id. Ms. Ferrell likewise did not observe Plaintiff biting his tongue or losing control of his bladder or bowels. Id. Betty Shuman witnessed Plaintiff have three seizures. (R. 262). She reports that Plaintiff "got stiff and fell back onto [the] floor. Then we couldn't get him to speak. He was there but not really. He was unconscious." Id. She reports loss of consciousness for about five minutes, and that Plaintiff was injured by "falling into things," hitting his head, and getting scrapes." Id. She also reported that afterward, Plaintiff was "tired, thirsty, and kind[ of] disoriented." Id.

### III.        THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## IV.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since April 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: osteoarthritis of the bilateral knees; and degenerative arthritis ofth e lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: no more than occasional postural movements, except for no crawling or climbing of ladders, ropes, or scaffolds; no exposure to hazards such as unprotected heights and moving mechanical parts; no concentrated exposure to extreme heat, extreme cold, and vibration; no foot control operation; and allowance to use a cane for all ambulation.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on February 13, 1979 and was 25 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 19-42).

## V.    DISCUSSION

It is well-settled that a claimant is not barred from presenting new evidence after the ALJ has rendered a decision, as expressly provided for by the Act and associated regulations. Such after-provided evidence warrants consideration "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see also C.F.R. § 404.970.

## A.    Standard of Review

Relevant here, there are three distinct standards of review contemplated by 42 U.S.C. § 405(g): 1) prong 1 of sentence four ("substantial evidence"), 2) prong 2 of sentence four ("legal error"), and 3) sentence six ("new evidence"). Which standard is appropriate depends upon the nature and circumstances of the Plaintiff's claim(s).

### 1.    Sentence Four

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence[2] (prong 1 of sentence four) and whether the correct law was applied"[3] (prong 2 of sentence four). Hays v.

---

[2] "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ." 42 U.S.C. § 405(g).

[3] "[W]here a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) hereof which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any

Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (footnote citations added).  Accordingly, judicial review of *facts* is deferential, and limited to a determination of whether the Commissioner's factual findings are supported by substantial evidence. Id. at 1456 (citing Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968) ("[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence.")). Judicial review of the Commissioner's conclusions of *law*, however, are afforded significantly less deference. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); see also Schoofield v. Barnhart, 220 F.Supp.2d 512, fn. 1 (D. Md. 2002)("The deferential standard set forth in 42 U.S.C. 405(g) provides only that findings 'as to any fact, if supported by substantial evidence, shall be conclusive ...' and suggests no limits on judicial review of the application of law and procedure by the agency").

## 2. Sentence Six

When a claimant submits new evidence *after* the ALJ's decision is issued, the appropriate standard of review depends upon the precise circumstances under which the "interim" evidence was provided. When interim evidence is provided to the Appeals Council, and the Appeals Council declines to disturb an ALJ's decision, the resulting decision of the Commissioner is reviewed under the "substantial evidence" standard of sentence four prong 1. Wilkins v. Sec'y, 953 F.2d 93 (4th Cir. 1991). If, however, the Secretary – that is, neither the ALJ nor the Appeals Council – had the opportunity to consider the interim evidence (typically, when the evidence is provided for the first time to the reviewing court), there are two possibilities contemplated by

---

regulation prescribed under subsection (a) hereof, the court shall review only the question of conformity with such regulations and the validity of such regulations." Id.

sentence six. First, the Commissioner herself may move for remand, to afford the Commissioner

an opportunity to consider the interim evidence.[4] Or, the reviewing court may consider whether

the interim evidence warrants a "new evidence" remand under sentence six of 42 U.S.C. §

405(g):

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new evidence
> which is material and that there is good cause for the failure to incorporate such evidence
> into the record in a prior proceeding.

"In assessing whether the claimant has made the requisite showings [for new evidence remand],

however, [t]his Court does not find facts or try the case de novo. King v. Califano, 599 F.2d at

599 (citing Vitek v. Finch, 438 F.2d 1157 (4th Cir.1971))." Finney v. Colvin, 637 F.App'x. 711

(4th Cir. 2016) (internal quotation marks omitted).

**B.      Contentions of the Parties**

Plaintiff, in his Motion for Summary Judgment, asks the court to grant Summary

Judgment in favor of the Plaintiff pursuant to Fed. R. Civ. P. 56  (Pl.'s Mot. at 1).  Specifically,

Plaintiff alleges that:

1.  The Commissioner erred by refusing to consider new and relevant evidence submitted
    with Plaintiff's appeal;

2.  The Commissioner erred by discounting Plaintiff's credibility with regard to his
    mental health and resulting limitations; and

3.  The Commissioner erred in determining that Plaintiff is not disabled under the
    relevant provisions of the Social Security Act.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 2, ECF No. 13). Plaintiff asks the Court

---

[4] "The court may, on motion of the Commissioner of Social Security made for good cause shown before the
Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further
action by the Commissioner of Social Security." 42 U.S.C. § 405(g), sentence six.

to "remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence in the record." (Id. at 14).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that the Commissioner's refusal to consider medical evidence submitted post-decision was not error, and that substantial evidence supports the ALJ's decisions with regard to credibility and severity.  (Def.'s Br. in Supp. Of Her Mot. for Summ. J. ("Def.'s Br.") at 4, ECF No. 18).

The issues involved in this decision are significantly more complex than that, however. Plaintiff's claims raise issues that separately require analysis under all three standards of review, and both avenues of remand. Plaintiff's first claim involves review for legal error under prong 2 of sentence four, but also a "new evidence" claim under sentence six. Plaintiff's second claim involves review for substantial evidentiary support under prong 1 of sentence four. Plaintiff's third claim invokes sentence four, though it is not necessary to reach that claim.

Ultimately, though the undersigned finds that the Commissioner's decision clearly meets the sentence six criteria for a new evidence remand, nonetheless, remand is *most* appropriate under the second prong of sentence four. However, before those conclusions can be fully explained, it is necessary to first identify and articulate what the Appeals Council actually did.

**C.     Analysis of the Commissioner's Decision**

Here, the Appeals Council explained:

In looking at your case, **we considered** the reasons you disagree with the decision and **the additional evidence listed on the enclosed Order of Appeals Council**.

(R. 2) (emphasis added). By "the additional evidence listed on the enclosed Order of Appeals Council," the Council was referring to only the following three pieces of evidence:

| Exhibit 13E | Representative brief from Phillip S Isner, Esquire, dated February 26, 2015 (5 pages) |
| Exhibit 28F | Medical records from Dr. Ali Khan and Associated Specialists, dated October 1, 2014 to October 8, 2014 ( 4 pages) |
| Exhibit 29F | Medical records from Davis Medical Center, dated May 29, 2014 to October 24, 2014 (18 pages) |

(R. 5). The Appeals Council determined that these three additional pieces of evidence alone, which *pre*-dated the hearing, did not warrant disturbing the ALJ's decision:

> We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence **currently of record**.
> We found that **this information does not provide a basis for changing** the Administrative Law Judge's decision.

(R. 2) (emphasis added). (For the sake of clarity, the undersigned refers hereinafter to this as the Appeals Council's "first decision.") These three records were only a portion of the evidence Plaintiff submitted to the Appeals Council. However, the Appeals Council declined to consider the remainder of the evidence Plaintiff provided (hereinafter the Council's "second decision"):

> We also looked at medical records from Davis Medical Center, dated December 19, 2014 to September 8, 2015 (27 pages); medical records from Tygart Valley Orthopaedics and Sports Medicine, dated February 26, 2015 to June 8, 2015 (24 pages); and records from Valley Health Care, dated December 12, 2014 (2 pages), dated January 30, 2015 (2 pages, submitted in duplicate), dated February 27, 2015 (1 page), and dated September 10, 2015 (2 pages). **The Administrative Law Judge decided your case through October 27, 2014. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before October 27, 2014.**

(R. 2) (emphasis added). The undersigned takes the Appeals Council's own explanation as to what they did and why – that the Council:

1. Recognized that all of the evidence submitted was new;

2. Evaluated whether evidence related back solely on the basis of its date;

3. Accordingly determined that all new evidence post-dating the hearing did not relate back on the basis of its date alone;

4. Excluded all after-dated evidence from its consideration;

5. Determined that the three pieces of evidence that pre-dated the hearing related back;

6. Determined these three pieces of evidence were not contrary to the weight of the evidence, and did not provide a basis for changing the ALJ's decision.

That much being ascertained, the undersigned next evaluates each action of the Appeals Council in turn. The Appeals Council's first error was to determine whether new evidence related back on the basis of its date alone. The result of this insufficient criteria was that the Appeals Council did not consider evidence it should have in arriving at its decision to deny review. Because the Council failed to make *all* of the rejected evidence part of the record, meaningful review for substantial evidentiary support as to the rest of the evidence is impossible.

**D.     The Appeals Council Erred in Determining Whether New, Material Evidence Related Back on the Basis of Its Date Alone.**

The Commissioner argues that the Appeals Council's determination that the after-provided evidence did not relate back "is supported by substantial evidence." (ECF No. 18 at 5). That is not the issue. The problem with the Appeal's Council's second decision is that it was reached by incorrect application of the law.

If the Appeals Council determines that the new evidence does not relate back, it will "explain why it did not accept the additional evidence." 20 C.F.R. § 404.976(b)(1). Here, the Appeals Council, determining that the new evidence did not relate back, explained that "[t]his new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before October 27, 2014." (R. 2).

The Fourth's Circuit's decision in <u>Bird v. Commissioner</u>, reversing a refusal to consider evidence simply because it post-dated the claimant's date last insured, is instructive in this situation inasmuch as it is error to exclude evidence from consideration on the basis of its date *alone*. <u>Finney</u>, 637 F.App'x at *718 (King, J. dissenting) (holding reached on other grounds).

Determination of whether new evidence "relates back" requires more of the Commissioner; a mere comparison of dates alone is insufficient. Id. (see also discussion E(1) below). Further, not only *may* the Appeals Council review and consider after-dated evidence, it is *obligated* to consider such evidence when it relates back. 20 C.F.R. § 404.976(b)(1).  It need not review or consider new evidence that relates *only* to a time period after the ALJ issues her decision. Id.

**E.     At Least One Piece of Plaintiff's Additional Evidence is New, Material, and Relates to the Period on or Before the ALJ Hearing Decision.**

**1.   Relation back**

The Commissioner offers an argument as to relation back that the Appeals Council itself never articulated: that L.P. Arbogast's letter does not "relate to the period on or before the [hearing]" because the letter 1) does not explicitly state that it relates back to the period prior to October 27, 2014, and 2) is written in the present tense; and further that Plaintiff "has not produced any records to demonstrate that Ms. Arbogast's findings in the letter refer to his treatment on or before October 27, 2014" (ECF No. 18 at 6). This argument fails. The Commissioner essentially asks the undersigned to find that L.P. Arbogast's letter, rather than referring to the entire five-month period of uninterrupted treatment prior, somehow excludes September 9, 2014 through October 27, 2014 and refers only to treatment on or after October 28, 2014. Not only is that position inconsistent with our precedent, it is also inconsistent with common sense and logic.

Plaintiff attended his first session with L.P. Arbogast on September 4, 2012, and was scheduled for weekly appointments thereafter. (R. 551). Although as noted elsewhere in this report and recommendation, it took some time to establish a treating relationship and for L.P. Arbogast to be able to render a proper opinion as to Plaintiff's prognosis and diagnoses, there is absolutely nothing to suggest that L.P. Arbogast's January 30, 2015 letter did not refer to the

entirety of the time Plaintiff was treated by her. In absence of any reason to suspect otherwise,
Plaintiff has met his burden to establish that L.P. Arbogast's letter clearly refers to a period of
time on or before the hearing, as it clearly referred to at least September 9, 2014 at the latest,
though almost certainly prior as well.

The Commissioner cites <u>Wilkins</u> as supportive of the Appeals Council's obligation to
*consider* new evidence only when it relates back, and <u>Gibson v. Barnhart</u>'s (50 F. App'x 182,
183, 4th Cir. 2002) brief citation of <u>Wilkins</u> as supportive of the Appeals Council determination
that the letter did not *affect* the ALJ's decision. However, the Commissioner cites no case or
authority in support of her assertion that this letter does *not relate back*:

> Here, there is no indication that the newly submitted evidence referred to Plaintiff's
> condition prior to the ALJ's decision. Plaintiff argues that Ms. Arbogast's opinion
> corroborates his administrative hearing testimony regarding the symptoms he
> experiences, but the letter from Ms. Arbogast does not state that it relates back to the
> period prior to October 27, 2014. The letter is written in the present tense, and Plaintiff
> has not produced any records to demonstrate that Ms. Arbogast's findings in the letter
> refer to his treatment on or before October 27, 2014.

(ECF No. 18 at 6). In the absence of any cited authority to support the Commissioner's assertion
that it does not relate back, nonetheless, a review of Fourth Circuit precedent leads directly to the
opposite conclusion.

"This court has recognized that a treating physician may properly offer a retrospective
opinion on the past extent of an impairment." <u>Wilkins</u>, 953 F.2d at *96. "[T]o warrant a sentence
six remand, the new evidence must 'relate to the time period for which benefits were denied,'
and not be merely probative 'of a later-acquired disability or of the subsequent deterioration of
[a] previously non-disabling condition.'" <u>Finney</u>, 637 F.App'x at *718, citing <u>Szubak v. Sec'y</u>,
745 F.2d 831, 833 (3rd Cir. 1984).

This is clearly not a case of an "after-acquired disability." <u>Finney</u>, 637 F.App'x at *718.
Plaintiff's mental health issues are hardly a recent development, nor are these diagnoses new.

There are documented mental health issues as far back as 1998 - including nervousness, episodes of hyperventilating, and "signs and [symptoms] of adjustment [disorder] NOS [with] mixed anxiety" that were significant enough to warrant his discharge from the military (R. 331). In 2011, emergency room records document Plaintiff's depression having reached an apparent breaking point (R. 500). Objective medical evidence in this record thus supports the assertion that Plaintiff's anxiety and depression were significantly limiting at multiple points in the past, and not just at this point. There is additionally significant subjective evidence of same, including reports of panic attacks and agoraphobia (which were later diagnosed).

Further, and directly applicable here, even when an examining doctor conducts an evaluation of a plaintiff *after* the ALJ decision and writes his report in the present tense, such evidence still "relates to the period on or before the date of the [ALJ] hearing decision" when it pertains to a condition or level of functioning that is "unlikely to vary in any meaningful way" in the time between the two. Riley v. Apfel, 88 F.Supp.2d 572 at *575 (W.D. Va. 2000) (holding that an IQ evaluation conducted three months after the ALJ's decision was not excludable under the regulations). In Wilkins, the Fourth Circuit held that a letter from plaintiff's treating physician dated fifteen days after the ALJ's decision was new, material, and related back to depression initially diagnosed ten years prior - even when there was a five-year gap between diagnosis and review where the plaintiff was not being treated for her depression. 953 F.2d 93 (4th Cir. 1991).

Recognizing that mental health conditions such as anxiety and depression may be somewhat more likely to vary than IQ, nonetheless, mental health issues tend to vary to the extent that they are worsened by stressors, and improved by treatment.[5] Here, it appears that

---

[5] The DSM-V repeatedly describes anxiety generally, and specific phobia disorders, as "recurrent" or "persistent." See "Anxiety Disorders" at p. 189. Further, the National Institutes of Health (NIH) and National Institute of Mental

Plaintiff had not begun receiving any meaningful longitudinal treatment until he became L.P. Arbogast's patient, and was largely untreated for many years. His stressors were consistently present, and had only worsened over time. However, most importantly, L.P. Arbogast's summary treatment records suggests that variance was unlikely in that short time frame. (R. 551).

The Commissioner essentially asks the undersigned to believe that the treatment that Plaintiff is now receiving for anxiety and mental health issues is unrelated to his longstanding complaints of those exact same issues; and that rather, by sheer coincidence, Plaintiff has only just recently developed anxiety and depression of a severity matching his self-complaints and documented medical evidence dating back to 1998. For obvious reasons, including objective medical evidence to the contrary in the record, the undersigned declines. Further, with this record, it is clear that Plaintiff's mental health issues have been significant at numerous documented points throughout the past decades – significant enough to be discharged from the military, and significant enough to land Plaintiff in the ER. His complaints have been essentially consistent over the years, with the exception of it having worsened in recent years, and at times becoming *particularly* severe.

### 2. Newness

The Commissioner further argues that Plaintiff has failed to show that the evidence is "new" – an argument not even the Appeals Council would agree with. The Appeals Council themselves described all of the after-dated evidence Plaintiff submitted as "new," but only considered some, finding the remainder to not relate back (albeit on improper grounds as discussed).

---

Health (NIMH) review treatments for anxiety disorders including psychotherapy (cognitive behavioral therapy, exposure therapy, or group therapy), stress management techniques, and prescription medications. See "Anxiety Disorders," available online at https://www.nimh.nih.gov/health/topics/anxiety-disorders/index.shtml#part_145338. Until Plaintiff began seeing L.P. Arbogast, it does not appear he had received any meaningful psychotherapy treatment (and possibly none at all). Although the record does note a prior referral to group therapy, his anxiety of being around groups of people rendered him unable to attend.

The Commissioner argues more specifically that Plaintiff has failed to show that the evidence is new because he "has not shown that the letter was not available at the time of the administrative hearing given that Plaintiff was seeing Ms. Arbogast at the time," or provide a "reasonable explanation for the untimeliness of the letter." Def.'s Br. at 6. However, the Commissioner does not cite any source or authority to support this assertion.[6] Further, unavailability and timeliness are factors that inform an assessment of *good cause* under § 404.970(b) and § 405(g) – not whether the evidence was *new*.

Rather, evidence is new if it is "not duplicative or cumulative." Wilkins, 953 F.2d at *96. Further, new evidence from a treating physician is *especially* probative by virtue of the presumption of great weight afforded to it. Id. at *96. Here, L.P. Arbogast's letter – an opinion from a treating psychological source based on longitudinal treatment – is a first for Plaintiff on multiple fronts. Although Plaintiff's *self-reports* as to his mental limitations from anxiety and other mental health problems are documented at length in the record, objective medical evidence to corroborate those statements was largely absent. And although the medical opinion of Dr. Joseph listed diagnoses of anxiety and major depression, it also considered Plaintiff's prognosis as "fair" and his limitations minimal. The ALJ expressly found that Plaintiff's mental impairments were not severe as a result, affording Dr. Joseph great weight, and that Plaintiff had "no limitation[s]" in activities of daily living and social functioning, and only "mild limitations" in concentration, persistence, and pace. (R. 23). Plaintiff was found to be lacking in credibility because his complaints were not reflected in the opinions of Drs. Joseph, Hursey, and Bartee.

Prior to the submission of Arbogast's letter, the record contained no opinion from any

---

[6] To the extent that the Commissioner cites Wilkins elsewhere, however, the undersigned would note that the facts of this case are easily distinguishable from Wilkins, in that Mr. Shuman's attorney was not in possession of any letters or opinions from Psych. Arbogast that could have been provided to the ALJ before his decision was rendered – nor does the Commissioner argue that he was.

treating psychological source. Dr. Joseph's opinion was based on a single encounter and examination, not longitudinal treatment. Drs. Bartee and Hursey's opinions were based on a review of records alone, and neither ever examined Plaintiff in person. Thus, an opinion from a treating specialist, based on longitudinal treatment of Plaintiff, addressing Plaintiff's mental limitations in greater detail than any other evidence of record, is not duplicative of any other medical evidence in this record, and nor is it merely cumulative.

### 3.   Materiality

New evidence is material "if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins at 96, citing Borders v. Heckler,777 F.2d 954, 956 (4th Cir. 1985). The undersigned finds that there is. In Wilkins, a letter written by a treating mental health doctor retrospectively addressing the claimant's depression was determined new and material when "no other evidence specifically addressed this issue." Id. at 96. In that case, however, the treating physician had seen the Plaintiff a number of years prior, which is not the case here with L.P. Arbogast. And here, there is some evidence in the record that addresses mental health issues. However, while other mental opinions had been offered as to Plaintiff's mental health issues, all three had a substantially more cursory basis. This record contains no other evidence from a medical source of any meaningful longitudinal *treatment* of Plaintiff's anxiety issues.

The consideration of Ms. Arbogast's letter would thus certainly have had some impact for a number of related reasons. First, in its absence, the *only* medical evidence in the record pertaining to Plaintiff's mental health is a single consultative examination by Dr. Joseph pursuant to Plaintiff's application for adult medicaid, and two agency reviewers' review of Plaintiff's (at that point, sparse) mental health records - all of whom considered Plaintiff's mental health on a single occasion only, two of whom had never met Plaintiff, and none of whom had any ongoing longitudinal treatment relationship with the Plaintiff.

"[N]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983), and "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006). However, although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).

It is therefore clear that the addition of mental health treatment records/opinion from a treating source could reasonably affect the outcome – particularly since the factors enumerated in 20 C.F.R. § 404.1527(c) weigh heavily in Ms. Arbogast's favor. She is an examining source and a specialist, as well as a treating source whose treatment has apparently been ongoing now for some time, and who has at this point developed significant knowledge about Plaintiff's impairment, and whose findings should be afforded some weight at minimum – and at the maximum, controlling weight. The regulations in fact specifically so provide, and clearly explain the policy rationales on which this directive is based:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical *professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and* may bring *a unique perspective* to the medical evidence *that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations* or brief hospitalizations.

20 C.F.R. § 404.1527(c)(1) (emphasis added). How much weight precisely, however, is the Commissioner's responsibility to determine on remand.

**F.**   **Plaintiff Is Not Required To Show Good Cause In This Case, And Even If He Was, Plaintiff *has* shown Good Cause.**

The Commissioner argues that Plaintiff has failed to show good cause because he "has not shown that the letter was not available at the time of the administrative hearing[,] given that Plaintiff was seeing [L.P.] Arbogast at the time of the hearing and purportedly could have proffered her letter for the ALJ's consideration." (ECF No. 18 at 6). The Commissioner's claims fail for multiple reasons.

First, a claimant must show good cause *only* when he presents new evidence for the first time to the reviewing *court*. "There is no requirement that a claimant show good cause when seeking to present new evidence before the *Appeals Council*," Wilkins v. Secretary, 953 F.2d 93, *97 n.3 (4th Cir. 1991) (emphasis added), since at that stage, the case is still "before the Secretary" under § 405(g). Plaintiff presented the new evidence to the Appeals Council, while the matter was still before the Commissioner. Accordingly, he is not required to show good cause for failure to present it sooner.

Second, even if he was, good cause is clearly satisfied here. "Sixth-sentence remand is appropriate only when the district court learns of evidence not in existence *or* available to the claimant at the time of the administrative proceeding that might have changed that proceeding's outcome." Sullivan v. Finkelstein, 496 U.S. 617, *618; 110 S.Ct. 2658, *2660; 110 L.Ed.2d 563 (1990) (emphasis added). The use of the disjunctive "or" here makes clear that good cause may be satisfied by either 1) evidence that simply does not exist at the time of the hearing, or 2) evidence that exists but is unavailable to the Plaintiff. The letter here satisfies the first condition, as a mere comparison of dates reveals that the letter was not available at the time of the hearing. L.P. Arbogast wrote the letter on January 30, 2015, approximately three months after the hearing before the ALJ took place. A letter written in January is not available the preceding October.

Indeed, a Plaintiff can hardly present evidence that does not exist at the time of the hearing before the ALJ. Turley v. Colvin, 2014 WL 2949383, at *4 (S.D.W.V. June 27, 2014) ("To state [the] obvious, [the doctor's] evaluation was only recently performed and, thus, the evidence did not exist at the time of the hearing"). See also Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985) ("There was good cause for [plaintiff] not submitting [new evidence] sooner, for the third laminectomy had not been performed").

The Commissioner appears to argue that the letter nonetheless *could* have been written sooner ("Plaintiff was seeing [L.P.] Arbogast at the time of the hearing and purportedly could have proffered her letter for the ALJ's consideration"). (ECF No. 18 at 6). Particularly in light of the fact that the Commissioner cites no case or authority to support the idea that this additional burden should be imposed upon Plaintiff, the undersigned fails to see the relevance. Regardless, Plaintiff has already met his actual burden to show that the letter was not in existence – and thus not available – at the time of the hearing.

And, though not his burden, Plaintiff *has* further shown that the letter could not have been written prior to the hearing. As the Commissioner herself acknowledges in that same brief, Plaintiff began seeing Licensed Psychologist Alicia Arbogast, M.A. in September 2014, the month preceding the October 27, 2014 hearing. (ECF No. 18 at 10). At the time of the administrative hearing, the treatment relationship between Plaintiff and L.P. Arbogast was thus in its infancy. In a Summary of Service record from Plaintiff's first session, L.P. Arbogast explicitly stated that Plaintiff's "progress and prognosis [we]re too early to determine" at that time (R. 551). It is therefore clear that L.P. Arbogast was *not* able to provide an opinion like the one contained in her January 2015 letter at the time of the hearing.

Because the Appeals Council improperly excluded new, after-dated evidence from consideration entirely, instead of determining whether it related back under the appropriate

standard, and because Plaintiff has shown that the ALJ's decision "might reasonably have been different" based on L.P. Arbogast's letter alone, this case must be remanded. The outstanding question is whether remand should be ordered under sentence four or sentence six.

### 4.     Remand

"A district court may remand a final decision of the Secretary only as provided in sentences four and six of 42 U.S.C. § 405(g):"

> [I]n conjunction with a judgment affirming, modifying, or reversing the Secretary's decision (sentence four),
> [O]r in light of additional evidence without any substantive ruling as to the correctness of the Secretary's decision, but only if the claimant shows good cause for failing to present the evidence earlier (sentence six).

Melkonyan v. Sullivan, 501 U.S. 89, 111 S.Ct. 2157 (1991). Remand under sentence four is appropriate when a reviewing court determines either that the Commissioner's findings of fact are not supported by substantial evidence (prong 1), or that the Commissioner has made a legal error (prong 2). Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). In such cases, sentence four of 42 U.S.C. § 405(g) authorizes the court to "modify[] or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." When remanding under sentence four, the reviewing court rules on the correctness of the Commissioner's decision and enters a final judgment affirming, modifying, or reversing it. Krishnan v. Barnhart, 328 F.3d 685 (D.C. Cir. 2003).

Alternatively, the court may "at any time order additional evidence to be taken before the Commissioner of Social Security," by remanding under sentence six. Without determining whether the ALJ's findings have substantial evidentiary support, the court may instead remand to the Secretary for new findings that incorporate the new evidence. Jackson v. Astrue, No. 476 F.App'x. 214 (4th Cir. 2012). A sentence six remand is interlocutory and non-appealable, and the reviewing court retains jurisdiction pending further development by the Commissioner.

Krishnan, 328 F.3d at 691 (citing Melkonyan: "[I]n a sentence-six remand, there is no final judgment until SSA returns to the district court to file SSA's "additional or modified findings of fact and decision," 42 U.S.C. § 405(g), and the district court enters a judgment").

In the Fourth Circuit, the line between sentence four and sentence six remands in the context of new evidence is mostly – but not entirely – clear. When new evidence is presented to the Appeals Council and made part of the record, remand is proper under sentence four. Wilkins, 953 F.2d.; Riley v. Apfel, 88 F.Supp.2d 572 (W.D. Va. 2000); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011). In these cases, because the new evidence was part of the record, the reviewing court could make a determination as to whether the ultimate decision of the Commissioner was supported by substantial evidence.

Sentence six remands, on the other hand, generally occur when a claimant presents new evidence for the first time to the district or appellate court – i.e., when the Commissioner has had *no* opportunity to consider the evidence or make it part of the record. Borders, 777 F.2d at *956 (remanding "for the submission and receipt of further evidence"). Under such circumstances, the reviewing court will typically remand under sentence six for the Commissioner to consider the new evidence, as long as it meets the criteria:

> The evidence must be 1) "relevant to the determination of disability at the time the application was first filed and not merely cumulative." Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. King v. Califano, 599 F.2d 597, 599 (4th Cir.1979); Sims v. Harris, 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g).

Borders v. Heckler, 777 F.2d 954, *955 (4th Cir.1991). If the evidence fails any of these prongs, remand is unwarranted. Finney, 637 F.App'x (denying sentence six remand after concluding new evidence failed the materiality prong); Fagg v. Chater, 106 F.3d 390 (Table), 1997 WL 39146, *2 (4th Cir. Feb 3, 1997) (denying sentence six remand after concluding the "evidence [was]

cumulative and [claimant] failed to demonstrate that it might reasonably have changed the [ALJ's] decision" if considered).

Another recent Fourth Circuit case, <u>Jackson v. Astrue</u>, is not as easily reconciled with its sentence six brethren. 467 Fed.App'x 214 (4th Cir. 2012). In <u>Jackson</u>, a claimant provided new evidence to the Appeals Council, while the case was still before the Commissioner; the evidence was made part of the record, and the Appeals Council determined that the new evidence "[did] not provide a basis for changing the [ALJ's] decision. <u>Id.</u> at *218. Rather than evaluating whether substantial evidence supported the ALJ's decision (as it stood post Appeals-Council) under sentence four, the Court remanded under sentence six, despite the Appeals Council having received and considered the new evidence once already. The court reasoned:

> Not only did these forms provide documentation that the ALJ's decision was lacking and eliminate the ALJ's very reason for denying Jackson's claim, they also reinforced the credibility of Jackson's testimony. Moreover, information reflected in the school record is directly material . . .
> We cannot say that substantial evidence supports the finding that Jackson failed to establish this prong where new and material evidence submitted to the Appeals Council contradicts both the ALJ's findings and underlying reasoning, and the Appeals Council failed to provide any reason for disregarding this additional evidence. In this situation, our proper disposition is to remand pursuant to sentence six of § 405(g) which authorizes a remand upon a showing of new material evidence."

<u>Id.</u> The distinction is not readily apparent – particularly because, presented with a seemingly identical scenario just one year prior in <u>Meyer v Astrue</u>, remand was ordered under sentence four. 662 F.3d 700 (4th Cir. 2011). In <u>Meyer</u>, like in <u>Jackson</u>, new material evidence was presented to the Appeals Council, who found the evidence did not providing a basis for changing the ALJ's decision. <u>Id.</u> at *704. The court, remanding under sentence four, reasoned:

> On consideration of the record as a whole, we simply cannot determine whether substantial evidence supports the ALJ's denial of benefits here. The ALJ emphasized that the record before it lacked "restrictions placed on the claimant by a treating physician," suggesting that this evidentiary gap played a role in its decision. Meyer subsequently obtained this missing evidence from his treating physician. That evidence corroborates the opinion of Dr. Weisglass, which the ALJ had rejected. But other record evidence

credited by the ALJ conflicts with the new evidence. The Appeals Council made the new evidence part of the record but summarily denied review of the ALJ decision. Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding. . . pursuant to sentence four of 42 U.S.C. § 405(g).

Id. at 707.

Nonetheless, the facts here present an additional complication not directly addressed by *any* of the preceding cases. Here, the evidence was presented to the Appeals Council, but it produced no decision that could be reviewed for substantial evidentiary support as to most of the new evidence.

Though there is an excellent possibility that the ALJ's decision is not supported by substantial evidence in light of the additional evidence, circumstances caution against such a finding. First, not all of the evidence is before the undersigned, and second, L.P. Arbogast's letter was not among the three pieces of evidence that the Appeals Council concluded would not provide a basis for changing the ALJ's decision. Although Plaintiff presented this evidence to the Appeals Council, it (erroneously) never considered what appears to be the strongest piece of evidence thus far. The Appeals Council never determined that this letter, or any of the other excluded new evidence, would not provide a basis for changing the ALJ's decision. As a result, there is *no* decision from the Commissioner as to the merits of the new evidence that the court could review for substantial evidentiary support. Therefore, remand is not proper under the "substantial evidence," or first prong, of sentence four.

Further, though the parties argue the factors of sentence six remand, and though this evidence *does* meet the sentence six criteria, the situation before the court does not square *completely* with other sentence six remands. As the preceding review reveals, sentence six remand is typically used when the evidence was *never* presented to the Commissioner – neither

to the ALJ *nor* the Appeals Council. Additionally, unlike sentence four remand, a district court remanding under sentence six does not enter a final judgment but rather retains jurisdiction of the case to give the Commissioner an opportunity to consider the new evidence. Melkonyan, 501 U.S. It appears that the spirit of sentence six remand, then, is to fairly balance the competing concerns of blameless parties. That is, it would not be entirely fair for the court to enter a *final* judgment against either a Commissioner who never had the opportunity to consider evidence; or likewise to deny a Plaintiff *with good cause* the opportunity to be heard.

Here, the Commissioner – through the Appeals Council – had the evidence before it, and had the opportunity to consider it properly. Instead, it committed legal error in failing to conduct a proper relation back analysis under our precedent and erroneously excluding relevant evidence from consideration as a result. Under these circumstances, the undersigned believes the *most* appropriate course of action is to remand the case under the second prong of sentence four of 42 U.S.C. § 405(g) for correction of the Commissioner's legal error.

## VI.   RECOMMENDATION

For the reasons herein stated, I find that the record of the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income was reached by an error of law. Accordingly, I **RECOMMEND** that the Plaintiff's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, the Defendant's Motion for Summary Judgment (ECF No. 17) be **DENIED**, the decision of the Commissioner be **VACATED,** and this case be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) for a reconsideration of Plaintiff's claim *including* the January 30, 2015 letter from treating psychologist Arbogast, to evaluate the remaining new evidence to determine which of it properly relates back, and include any qualifying new evidence in its consideration, in accordance with this report and recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is **DIRECTED** to provide a copy of this Report and Recommendation to counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 24[rd] day of May, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE